IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JAMES S.,**[1] <br><br> **Plaintiff,** <br><br> v. <br><br> **COMMISSIONER OF SOCIAL SECURITY,** <br><br> **Defendant.** | Case No. 3:23-CV-3009-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

Plaintiff James S. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB"). For the following reasons, the Commissioner's decision is reversed and remanded for rehearing and reconsideration of the evidence.

### PROCEDURAL HISTORY

Plaintiff applied for DIB on September 1, 2021, alleging disability beginning on July 31, 2019, after a work-related accident that led to a right shoulder injury. (Tr. 150-53). The application initially was denied on March 30, 2022 (Tr. 85-89), and it was denied upon reconsideration on August 17, 2022. (Tr. 97-101). Plaintiff timely requested a hearing (Tr. 102-03), and a hearing was held before Administrative Law Judge Michael Scurry ("ALJ") on February 7, 2023. (Tr. 30-68). On March 1, 2023, the ALJ issued an unfavorable

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

decision, finding Plaintiff was not disabled. (Tr. 14-26.) The Appeals Council denied Plaintiff's request for review on July 10, 2023, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6).

Plaintiff now appeals the denial of DIB directly to this Court. Plaintiff raises three issues: (1) whether the ALJ's decision fails to acknowledge that Plaintiff's functional use of his dominant extremity worsened during the period in question; (2) whether the ALJ relied on a state agency consultant medical opinion that addressed Plaintiff's physical ability on December 31, 2021, and no later; and (3) whether the ALJ relied on vocational testimony that was internally inconsistent and failed to meet the threshold of substantial evidence. (Doc. 10). The Commissioner filed a brief in opposition (Doc. 17), and Plaintiff filed a timely reply (Doc. 18).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* The Supreme Court defines substantial evidence as "more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The reviewing court may not "reweigh the evidence, resolve

debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where an ALJ ignores a whole line of evidence contrary to the ruling, however, a district court cannot assess whether the ruling rested on substantial evidence and must remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

## DISABILITY UNDER THE SOCIAL SECURITY ACT

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for any consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by accepted diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

At a Social Security hearing, an ALJ uses a five-step evaluation to assess whether

a claimant may engage in substantial gainful activity. *Milhem v. Kijakazi*, 52 F.4th 688, 691 (7th Cir. 2022). The ALJ asks whether:

1. the claimant is presently employed;

2. the claimant has a severe impairment or combination of impairments;

3. the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity;

4. the claimant's residual functional capacity leaves him unable to perform his past relevant work; and

5. the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Id.* The claimant bears the burden of proof at steps one through four. *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is limited to the points raised by Plaintiff.

**I.      Relevant Medical Records**

In July 2019, Plaintiff injured his right shoulder while at work as a correctional officer when he attempted to sit in a rolling chair that moved out from underneath him. (Tr. 246). Dr. Matthew Bradley of DB Orthopedic Institute examined Plaintiff and performed an MRI, which revealed a complete tear of the rotator cuff involving the

supraspinatus and the infraspinatus with significant retraction. (*Id.*). Dr. Bradley recommended surgery, and on October 1, 2019, he performed arthroscopy of Plaintiff's right shoulder with labral debridement, biceps tenotomy, subacromial decompression, and an attempted rotator cuff repair. (*Id.*). The supraspinatus could not be fully repaired, however, so a partial rotator cuff repair was performed. (*Id.*).

After his first surgery, Plaintiff was unable to fully regain his motion and continued to have significant pain and disfunction in his right shoulder. (Tr. 445). Dr. Bradley suggested a reverse total shoulder arthroplasty. (*Id.*). Plaintiff received a second opinion from Dr. George A. Paletta, Jr., of the Orthopedic Center of St. Louis. (Tr. 246).

Dr. Paletta noted that despite postoperative physical therapy, Plaintiff had continued complaints of pain and disfunction in his right shoulder. (*Id.*). Plaintiff reported weakness when trying to lift anything, difficulty raising his arm overhead, and popping and grinding in the shoulder. (*Id.*). Dr. Paletta observed well healed surgical incisions but noted that Plaintiff had a limited active range of motion. (*Id.* at 247). Upon reviewing an MRI completed on January 23, 2020, Dr. Paleta found a massive, retracted rotator cuff tear. (*Id.*). Dr. Paletta stated that it was reasonable for Dr. Bradley to have attempted the rotator cuff repair, but unfortunately it was not repairable due to poor tissue quality and extensive tissue retraction—and likely would not be repairable if a second effort were made. (*Id.*). Dr. Paletta further stated that there were two viable treatment options—superior capsular reconstruction or reverse total shoulder arthroplasty—although neither would be likely to return him to full normal function with

Page 5 of 18

full range of motion and full overhead strengthening. (*Id.* at 248). With regard to work restrictions, Dr. Paletta recommended no lifting above chest level, no repetitive overhead activities, and no inmate contact. (*Id.*).

On August 12, 2020, Dr. Bradley performed a reverse shoulder joint replacement. (Tr. 416). Less than a month after his shoulder replacement surgery, Plaintiff returned to Dr. Bradley with whole body aches and chills, fever, and increasing pain. (Tr. 443). Dr. Bradley recommended a surgical irrigation and debridement of the right shoulder, which was completed on September 9, 2020. (*Id.*). In February 2021, x-rays showed overall excellent alignment, no signs of osteomyelitis, no free air, and no current signs of postoperative infection. (Tr. 305). Dr. Bradley placed Plaintiff on moderate functional capacity restrictions regarding lifting, including no use of the right arm and no inmate contact. (*Id.*).

Plaintiff reported doing well until November 1, 2021, when he presented to Dr. Bradley with increased swelling, redness, and pain around his shoulder incision. (Tr. 439). Dr. Bradley noted fluid around the tissue and possibly deep into the shoulder joint. (Tr. 440). Dr. Bradley referred Plaintiff to a shoulder specialist with experience in reverse total shoulder arthroplasty infection. (*Id.*).

Plaintiff's shoulder implant became chronically infected. (Tr. 347). While he had been keeping the infection suppressed with oral antibiotics, Dr. Randall Otto at SSM St Clare Hospital explained that continuing with prophylactic antibiotics can lead to bone erosion due to osteomyelitis, which in turn would lead to a loosening of the prosthetic stem and worsening pain and function. (*Id.*). On February 7, 2022, Dr. Otto performed a

right shoulder incision and drainage with removal of the reverse shoulder prosthesis. (Tr. 340). An antibiotic cement spacer was inserted, and a wound VAC was applied. (*Id.*). Plaintiff remained in the hospital on IV antibiotics until February 9, 2022, when another incision and drainage was performed and a hemiarthroplasty [2] was inserted. (*Id.*). Plaintiff received a PICC line for at-home IV antibiotics. (*Id.*).

At Plaintiff's six-week follow-up appointment, Dr. Otto noted that Plaintiff was doing well but continued to be in a brace. (*Id.* at 467). Plaintiff's cultures came back as positive for MRSA. (*Id.*) At that time, Plaintiff's range of motion in his right shoulder was 80 degrees forward elevation, 70 degrees abduction, and 30 degrees for external rotation. (*Id.* at 470). Dr. Otto planned to schedule a revision surgery with a right reverse shoulder arthroplasty on May 2, 2022. (*Id.* at 471). He also noted that Plaintiff would remain on oral antibiotics permanently. (*Id.*).

## II.     State Agency Examiners

State agency medical consultants reviewed the record on March 9, 2022, and again on reconsideration on April 16, 2022. (Tr. 70-84). Dr. John Peterson noted the following: Plaintiff's massive rotator cuff tear that occurred on July 31, 2019; the failed attempt to repair the rotator cuff; revision of that surgery to a reverse shoulder joint replacement; Plaintiff's third surgery for irrigation and debridement; his subsequent infection; the removal of the reverse shoulder prosthesis; insertion of the antibiotic cement spacer; and insertion of the hemiarthroplasty. (Tr. 74). Dr. Peterson further noted Plaintiff's range of

---

[2] A shoulder hemiarthroplasty is a shoulder replacement in which the damaged humeral head is replaced with a prosthetic humeral head. Shoulder Hemiarthroplasty, MedScape, https://emedicine.medscape.com/article/2000818-overview (last visited Sept. 5, 2024).

motion in his dominant right shoulder was 160 degrees for forward elevation, 160 degrees for abduction, and 60 degrees internal rotation. (*Id.*). He found that Plaintiff could perform light work with occasional stooping, kneeling, and crouching, but no crawling or ladder, rope, or scaffold climbing. (*Id.* at 75). On reconsideration, Dr. Judith Kelly affirmed and further found Plaintiff is limited to occasional reaching and handling in the right upper extremity. (Tr. 80-82).

### III. Evidentiary Hearing

Plaintiff appeared via telephone and was represented by counsel at the hearing before the ALJ on February 7, 2023. (Tr. 30-68). Vocational expert Jo Ancell also appeared by telephone. (*Id.*)

Plaintiff testified that, prior to his shoulder injury, he was working as a correctional major in an Illinois prison. (Tr. 39). As a major, he was in control of all inmate movement, security, and staffing. (Tr. 40). He also had to make rounds, go in the housing units, inspect towers, and carry boxes of inmates' property. (Tr. 43).

On July 31, 2019, Plaintiff had just finished making rounds when he returned to his desk to complete paperwork. (*Id.*). As Plaintiff went to sit down, his desk chair rolled up from underneath him and he fell into the desk with full force on his right shoulder. (Tr. 44). The fall caused all tendons and ligaments to rip off of his bone. (*Id.*). Plaintiff testified that he had rotator cuff surgery, but the surgeon told him that he could not get the tendons to pull down from his neck to reattach them, so it likely would not hold. (Tr. 45). When the rotator cuff repair failed, he had a full shoulder replacement. (Tr. 46). The shoulder replacement then became infected, which "put [him] down for quite a

while." (*Id.*). The surgeon then took the hardware out, cleaned the inside of his arm, and put in back in. (*Id.*). But the infection came back, so yet another operation was performed. (*Id.*). In total, Plaintiff had six surgeries done on his right shoulder. (*Id.*).

Plaintiff testified that, since his injury, he is home all the time and only walks in his yard to get some exercise. (Tr. 48). He used to board and ride horses, which was one of his favorite pastimes, but he had to give that up because of his shoulder (*Id.*). Plaintiff explained that he was afraid of getting kicked or falling off a horse, which would put him "in a real pickle." (*Id.*). While he does go to the store once in a while, he does not carry stuff into the house like he used to do. (*Id.*). He cannot lift things like he used to, he has difficulty reaching over his head, and it is difficult for Plaintiff to put a belt on because of his shoulder. (*Id.*). Plaintiff also testified that he is very careful with his arm because the stem of the shoulder replacement puts stress on his bone, which could cause the bone to splinter or fracture. (*Id.*).

With regard to daily activities, Plaintiff testified that getting dressed is difficult, as is lifting or reaching for things. (Tr. 49). He has to be careful when taking things out of the refrigerator, especially gallons of milk, and he has broken several tea pitchers because he did not have the strength to lift them. (Tr. 50). He also has trouble washing his back while in the shower. (*Id.*).

The vocational expert, Jo Ancell, also testified at the hearing. The ALJ asked the vocational expert whether there were any jobs in the national economy that a person with Plaintiff's age, education, work experience, and residual functional capacity (RFC) could perform—*i.e.*, light work, no lifting more than five pounds with the right arm,

occasionally pushing or pulling up to 10 pounds with the right arm, no crawling, no climbing ladders, ropes or scaffolding, occasionally stooping, kneeling, and crouching, and no contact with inmates in a penal institution. (Tr. 53). The vocational expert testified that an individual with this RFC could perform the jobs of security guard and patroller. (Tr. 54-55). When asked whether there were any jobs in the national economy assuming the same limitations but sedentary rather than light work, the vocational expert replied that there were none. (Tr. 55).

## DECISION OF THE ALJ

In reaching his decision, the ALJ considered the entire record.

At step one, the ALJ concluded Plaintiff had not engaged in substantial gainful activity since his alleged onset date of July 31, 2019. (Tr. 19).

At step two, the ALJ concluded that Plaintiff had the following severe impairments: right shoulder impairment, status post reverse shoulder joint total replacement; right foot talonavicular degenerative disease with avascular necrosis navicular of right foot; osteoarthritis of both ankles; and obesity. (*Id.*). The ALJ noted that these medically determinable impairments significantly limit Plaintiff's ability to perform basic work activities. (Tr. 20).

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in the Social Security regulations. (*Id.*).

At step four, the ALJ found that Plaintiff has the RFC to perform light work except Plaintiff can lift no more than five pounds overhead with the dominant right upper

extremity, occasionally push and/or pull with the right upper extremity 10 pounds, occasionally reach and handle with the right upper extremity, never climb ladders/ropes/scaffolds or crawl, occasionally stoop, kneel, and crouch, avoid even moderate exposure to hazards, and have no inmate contact in a penal institution. (*Id.*).

In coming to this conclusion, the ALJ considered Plaintiff's self-reported limitations in his ability to lift, reach, and walk; his inability to be on his feet more than 15 to 20 minutes at a time or more than two hours total in an eight-hour day; his right shoulder injury; and his subsequent infections and surgeries. (Tr. 21). The ALJ then found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (*Id.*).

Specifically, with regard to Plaintiff's shoulder, the ALJ considered the report of Dr. Emanuel, Plaintiff's independent medical examiner for Worker's Compensation. Dr Emmanuel examined Plaintiff on January 18, 2021, and opined that Plaintiff would likely have permanent lifting restrictions no greater than 40 pounds, no lifting greater than 20 pounds from floor to waist, 15 pounds from waist to shoulder height, and no lifting greater than 5 pounds overhead. (Tr. 22). The ALJ also considered Dr. Emanuel's subsequent evaluation on June 7, 2021. (*Id.*). At that time, Plaintiff was still not working, had some atrophy, weakness in internal rotation, and reduced strength. (*Id.*). Dr. Emanuel opined that the claimant was limited to lifting no greater than 30 pounds from floor to waist, 20 pounds from waist to shoulder, and 5 pounds overhead; and he was restricted

from repetitive reaching, pushing, pulling, or lifting at chest height or above. He also opined that Plaintiff also should not carry more than 30 pounds for 50 feet, should not climb ladders, and should not have inmate contact. (*Id.*).

The ALJ briefly considered that Plaintiff "continued to develop MRSA infection in February of 2022 and underwent a two-stage surgical intervention. Following the first part, the claimant was doing well and his pain was controlled." (*Id.*).

Additionally, the ALJ considered Plaintiff's testimony that he is limited in his ability to reach, lift, and carry with his right upper extremity; that he cannot carry groceries or reach behind him; and that he has stopped raising and riding horses, not because he cannot perform the work but because he is afraid of getting injured. (Tr. 24).

The ALJ did not give controlling weight to any prior administrative medical findings or medical opinions. While he found the state agency medical consultants' opinions persuasive, he found that Plaintiff should be further restricted to not lifting more than 5 pounds overhead with the dominant right upper extremity, occasionally pushing or pulling 10 pounds with the right upper extremity, and no inmate contact in a penal institution. (Tr. 23). Given this RFC, the ALJ found that Plaintiff is unable to perform any past relevant work as a correctional officer. (Tr. 24).

At step five, the ALJ considered the vocational expert's testimony about Plaintiff's age, education, work experience, and RFC. (Tr. 25). The ALJ accepted the vocational expert's testimony as reasonable and reliable and found Plaintiff has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy: security guard and patroller. (Tr. 25).

For these reasons, the ALJ found that a finding of "not disabled" from July 31, 2019, to the date of his decision was appropriate.

## DISCUSSION

**I. Whether the ALJ failed to consider evidence that Plaintiff's functional use of his right shoulder worsened during the period in question.[3]**

The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *Joseph W. v. O'Malley*, No. 23-CV-3084-SMY, 2024 WL 4143613, at *4 (S.D. Ill. Sept. 11, 2024) (citing 20 C.F.R. § 404.1545(a)). It is "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities," *id.*, and must be supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). An "ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). However, "an ALJ need not mention every piece of evidence, so long as he builds a logical bridge from the evidence to his conclusion." *Id.* (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)).

Here, Plaintiff argues that the ALJ ignored evidence of his worsening condition during the period in question. Dr. Otto—the surgeon who performed his shoulder implant after it became infected, inserted the antibiotic cement spacer, and reimplanted a hemiarthroplasty—observed on March 22, 2022, that Plaintiff's range of motion was limited to 80 degrees forward elevation, 70 degrees abduction, and external rotation of

---

[3] The Court has combined Plaintiff's first and second points into one analysis.

30 degrees. Plaintiff also had significantly worse scores on his Simple Shoulder Test (SST), the American Shoulder and Elbow Surgeons Standardized Shoulder Assessment (ASES), and Single Assessment Numeric Evaluation (SANE) on March 22, 2022, as opposed to November 19, 2021. (Tr. 470-71). Yet, the ALJ's *only* mention of Dr. Otto's notes regarding the infection and subsequent surgeries was: "The claimant continued to develop MRSA infection in February of 2022 and underwent two-stage surgical intervention (Exhibit 5F). Following the first part, the claimant was doing well and his pain was controlled (Exhibit 9F-8)." Plaintiff argues the ALJ's failure to consider Dr. Otto's observations regarding his decreased range of motion is error.

Plaintiff also points to the ALJ's reliance on Dr. Kelly's opinion. Plaintiff argues that Dr. Kelly incorrectly listed Plaintiff's date last insured as December 31, 2021. Thus, the consultant's opinion was incorrectly limited to December 31, 2021, and does not reflect the worsening of his condition after that date.

In response, the Commissioner acknowledges that the ALJ did not specifically discuss Dr. Otto's observation of reduced range of motion or Plaintiff's SST and ASES scores but argues this does not merit remand because an ALJ need not mention every detail in the record. Furthermore, even if Plaintiff had a reduced range of motion, Plaintiff testified that he merely had "difficulty" reaching over his head. The Commissioner argues that Plaintiff has not cited any evidence compelling a finding that he was more limited than the ALJ determined, and it is Plaintiff's burden to show the ALJ's decision is not supported by substantial evidence. The Commissioner further asserts that although Dr. Kelly incorrectly stated a last insured date of December 31, 2021, the record indicates

that Dr. Kelly considered Plaintiff's infection and subsequent surgeries in February 2022.

In reply, Plaintiff argues that it was error for the ALJ to construe his vague statement that he has "some difficulty" reaching overhead as evidence that overcomes Dr. Otto's objective medical observations. Plaintiff also takes issue with the Commissioner's reliance on the ALJ's finding that Plaintiff had to give up his horses "because he was afraid of injury, not because he could not do the activities." Plaintiff argues that horses were his favorite pastime and he had to give up his horses as a result of his shoulder injury and the risk that he would injure it further.

This Court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021)). Where an ALJ ignores a whole line of evidence contrary to the ruling, however, a district court cannot assess whether the ruling rested on substantial evidence and must remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

As an initial matter, it is unclear whether Dr. Kelly actually did consider Plaintiff's worsening range of motion. Dr. Kelly's report refers to Plaintiff's range of motion from February 2022, but it does *not* mention his reduced range of motion from March 2022, even though she completed her report on reconsideration in August 2022. Therefore, even if the date last insured was a mere typographical error, Dr. Kelly's report is not reliable and substantial.

Furthermore, the ALJ only briefly mentioned Plaintiff's MRSA infection in February 2022 and the fact that he underwent a two-stage surgery. He did not discuss the

details of the surgeries or the fact that Plaintiff would need to be on prophylactic antibiotics permanently, which Dr. Otto explained can lead to bone erosion, a loosening of the prosthetic stem, and worsening pain and function. The ALJ also failed to discuss Plaintiff's considerably decreased range of motion in March 2022. While the Commissioner speculates that the ALJ may have discounted Plaintiff's reduced range of motion because Plaintiff testified that he merely had "some difficulty" reaching overhead, the ALJ did not provide this rationale in his opinion. *See Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013).

An ALJ may not discredit a claimant's testimony about his limitations solely because there is no objective medical evidence supporting it. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). In this case, the ALJ discounted both Plaintiff's testimony *and* the objective medical evidence supporting it. Plaintiff testified that he cannot carry or lift things like groceries and it is difficult to wash his back, reach overhead, or put on a belt, which is supported by the reduced range of motion reported by Dr. Otto. Plaintiff also must be very careful with his arm because the stem of the shoulder replacement puts stress on his bone, which could cause the bone to splinter or fracture—hence his hesitancy to ride horses. (*Id.*). The ALJ's finding that Plaintiff could ride a horse but is choosing not to in order to avoid injury is a gross oversimplification of the evidence.

The most recent medical evidence in the record indicates that Plaintiff's range of motion worsened due to a MRSA infection that may indeed be permanent, and Plaintiff's testimony supports that evidence. Because the ALJ failed to appropriately consider this evidence, remand is warranted.

**II.	Whether the ALJ relied on vocational testimony that was internally inconsistent and failed to meet the threshold of substantial evidence.**

Plaintiff next argues that the testimony of the Vocational Expert, Jo Ancell, was insufficient to support the ALJ's conclusion because she counted the same jobs twice and gave job numbers that included skill levels higher than those of Plaintiff's past relevant work.

During the evidentiary hearing, Ms. Ancell testified that an individual with Plaintiff's work experience and RFC could perform work in the occupational industry of security guard and said there were and there were 766,000 jobs at the national level. (Tr. 53-54). Ms. Ancell provided a *Dictionary of Occupational Titles* (DOT) code of 372.667-030, which is for a gate guard. Ms. Ancell further testified that Plaintiff could also work as a patroller in the occupational industry of transit and railroad police and that there are 4,000 of those jobs. (Tr. 55). Ms. Ancell provided a DOT code of 376.667-018. When questioned by Plaintiff's counsel about how Ms. Ancell derived those job numbers, she acknowledged that the 766,000 jobs were at the industry level and included security guard, gate guard, bodyguard, and patroller. (Tr. 60). Ms. Ancell further testified that the 4,000 jobs in the industry of transit and railroad police included patroller, special agent, and special agent in charge. (Tr. 57). However, Ms. Ancell also admitted that "special agent" had a higher skill level than Plaintiff's past work, so she excluded that occupation. (Tr. 59-60).

Plaintiff argues that his attorney "caught" Ms. Ancell counting the same job of patroller in the numbers for two different occupations and including jobs that had higher

skill levels than Plaintiff's previous work. Therefore, her testimony was insufficient to support the ALJ's conclusion.

The Court disagrees. Although the job of "patroller" was mentioned twice, it was within two different occupational industries: the security guard industry and the transit and railroad police industry. There is no evidence that Ms. Ancell double counted the numbers for "patroller." Ms. Ancell further explained that she only included semi-skilled jobs in her analysis and did not include numbers for the skilled special agent job in her job-number estimates.

## Conclusion

For these reasons, the Commissioner's final decision denying Plaintiff's application for Disability Insurance Benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

DATED: September 20, 2024

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judges**